IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PERCELLA BROWN,                    §
                                   §
        Plaintiff,                 §
                                   §
v.                                 §    CIVIL ACTION NO. 4:12-CV-1849
                                   §
CAROLYN W. COLVIN,[1] ACTING       §
COMMISSIONER OF THE                §
SOCIAL SECURITY                    §
ADMINISTRATION,                    §
                                   §
        Defendant.                 §

<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Cross-Motion for Summary Judgment (Doc. 10).  The court has considered the motions, the responses, all other relevant filings, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration

---

[1]    Michael J. Astrue was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position. Carolyn W. Colvin is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant. <u>See</u> Fed. R. Civ. P. 25(d).

[2]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Doc. 8.

("Commissioner" or "Defendant") regarding Plaintiff's claim for disability benefits under Title II and Title XVI of the Social Security Act ("the Act").

## A.  Medical History

Plaintiff was born on July 21, 1952, and was fifty-six years old on the date of the alleged onset of disability, January 12, 2009.[3]  Plaintiff has a high school education with some college and previously worked as a waitress for a catering service, a supervisor verifying orders, and a call taker for a taxi service.[4]  Plaintiff ceased all employment on January 12, 2009.[5]

### 1. Stroke and Left-Side Weakness

Plaintiff's medical history reflects that, between 1996 and 1997 and again in 2004, Plaintiff experienced a small vessel stroke.[6]  On September 2, 2004, Plaintiff was admitted to Ben Taub General Hospital complaining of "left-side weakness consistent with a recurrent stroke."[7]  A computed tomography ("CT") scan of Plaintiff's head confirmed the existence of prior small vessel

---

[3]     See Doc. 11, Tr. of the Admin. Proceedings ("Tr.") 35, 119, 127.  The court notes that Plaintiff's alleged onset date of disability is based on the date she ceased employment for reasons she stated were unrelated to her medical impairments.  Plaintiff reported in her disability report that she believed her conditions were sufficiently severe as of October 15, 2009, to render her unable to work.  See Tr. 148.

[4]     See Tr. 42, 48–50, 119, 139–43, 148–49, 158.

[5]     See Tr. 35, 142, 149.

[6]     See Tr. 356.

[7]     Tr. 356–57.

ischemic events.[8]   Plaintiff was unable to walk at the time of admission due to weakness but was walking well at the time of discharge with most of her motor weakness resolved.[9]   Plaintiff returned to work after both strokes and worked continuously until January 12, 2009.[10]

Medical assessments of Plaintiff between 1998 and 2010 noted that Plaintiff complained of residual left-side weakness causing a slightly slower gait and loss of feeling in her left arm and hand.[11] On May 4, 1998, following her first stroke and prior to the date of alleged onset of disability, Plaintiff visited the emergency room complaining that her left arm was numb.[12]   During questioning with a social service agent, Plaintiff stated the numbness began after she smoked crack cocaine.[13]

Post-stroke, Plaintiff used a cane or walker,[14] but medical records reflect that the use was not constant.[15]   Documentation by practitioners after the alleged onset date of disability indicated

---

[8]     See Tr. 357, 366.

[9]     See 343, 356–57.

[10]    See Tr. 36, 158.

[11]    See Tr. 332, 452, 487, 535, 539–40, 551, 585, 734, 752, 787, 904.

[12]    See Tr. 539–40, 551.

[13]    See Tr. 535.

[14]    See Tr. 332, 665, 752.

[15]    See Tr. 340, 371, 570, 658, 741, 753, 904, 917.

that Plaintiff's complaints of motor weakness were sporadic.[16]  On October, 14, 2009, Plaintiff's treating physician noted that Plaintiff was "ambulatory with [a] steady gait" and had walked to the emergency room from her home.[17]  During a visit with Paul R. Damaske, M.D. ("Dr. Damaske") on January 26, 2010, Plaintiff reported that she had no physical limitations and did not use assistive devices.[18]  On February 24, 2010, Swarajya Pabbisetty, M.D. ("Dr. Pabbisetty") referred Plaintiff to physical therapy, noting that Plaintiff suffered from weakness on her left side, had an abnormal gait, and experienced increased left-side weakness.[19]

During a consultative clinical interview and mental status examination performed on April 7, 2010, Pauline Clansy, Ed.D. ("Dr. Clansy") noted that Plaintiff's "gait [was] slightly slower and stiffer than normal."[20]  Shortly after, on April 12, 2010, at a consultative exam with Farzana Sahi, M.D. ("Dr. Sahi"), Plaintiff reported that her mobility was limited to "walking 100 feet," "standing for 30 feet," and walking one flight of stairs.[21] Plaintiff was not using any assistive devices at the time she met

---

[16]   See Tr. 371, 564, 570, 741, 752, 917.

[17]   Tr. 371; see also Tr. 917.

[18]   See Tr. 570.

[19]   See Tr. 564.

[20]   Tr. 658.

[21]   Tr. 664.

with Dr. Sahi, but Plaintiff reported that she occasionally used a cane.[22] Dr. Sahi concluded that Plaintiff's "sensation to pinprick and vibratory sensation were normal in all four extremities, grip strength was good bilaterally," and power in all of Plaintiff's extremities equaled four out of five.[23] Further, Dr. Sahi noted that Plaintiff walked with a limp on her left side.[24] Dr. Sahi recorded that Plaintiff was right-handed and was "able to write and hold a cup," as well as "able to use a jar and skillet."[25] Plaintiff experienced difficulty lifting weights.[26]

During a physical therapy evaluation on April 13, 2010, Plaintiff reported that she had "weaned herself from a walker" and occasionally walked without the aid of a single point cane.[27] The physical therapist noted that Plaintiff was without a cane on the day of the appointment.[28] From the evaluation, the physical therapist concluded that Plaintiff was "able to walk community distances without [an] AD [assistive device]."[29] It was also determined that Plaintiff's activity tolerance was poor, her left

---

[22]   See Tr. 664, 666.

[23]   Tr. 666.

[24]   See id.

[25]   Tr. 664.

[26]   See Tr. 665.

[27]   Tr. 752.

[28]   See id.

[29]   See  Tr. 753.

leg was slightly weaker than her right, and her coordination and sensation were within normal limits.[30] During a subsequent hospital visit on May 31, 2010, a nurse documented that Plaintiff's gait was "steady."[31] In December 2010, Plaintiff denied having any residual weakness from her strokes.[32]

### 2. Other Impairments

Plaintiff's medical record indicates that Plaintiff suffered from chronic hypertension marked by high blood pressure.[33] Plaintiff was diagnosed with hypertension in 1994.[34] Doctors noted that, generally, Plaintiff adhered to her medication regimen.[35] The longest recorded period of time Plaintiff went without blood pressure medication after her diagnosis of hypertension was for the eight-month period prior to January 29, 2008.[36] At the time of her consultative exam with Dr. Sahi in April 2010, Plaintiff's blood pressure was under control with medication.[37]

---

[30]   Id.

[31]   See Tr. 741, 904.

[32]   See Tr. 1015.

[33]   See Tr. 733.

[34]   See Tr. 664.

[35]   See, e.g., Tr. 335, 560, 733.

[36]   See Tr. 705.

[37]   See Tr. 666.

Plaintiff alleged that she experienced urinary incontinence.[38] During a hysterectomy which took place on October 15, 1997, lacerations to Plaintiff's bladder required surgical repair.[39] At her January 26, 2010 visit with Dr. Damaske, Dr. Damaske noted that Plaintiff was not experiencing urinary frequency.[40]  On May 31, 2010, Plaintiff was diagnosed and treated for a urinary tract infection.[41]  A record from Plaintiff's visit to Dr. Pabbisetty on November 15, 2010, indicated that Plaintiff was "unable to hold her bladder."[42]  Dr. Pabbisetty prescribed medication for Plaintiff's incontinence.[43]

Plaintiff also reported feelings of depression on several occasions.[44]  The record indicates that Plaintiff was treated for attempted suicide on December 28, 2004.[45] At a May 16, 2005, doctor's appointment, it was noted that Plaintiff refused to take the prescribed Zoloft.[46]  On September 6, 2005, Plaintiff stopped

---

[38]    Tr. 980.

[39]    See Tr. 255.

[40]    See Tr. 568, 604, 762.

[41]    See Tr. 914.

[42]    Tr. 980.

[43]    See Tr. 983.

[44]    See, e.g., Tr. 331, 336, 801, 807.

[45]    See Tr. 338, 340, 807-08, 817.

[46]    See Tr. 332, 798.

taking Zoloft, a medication prescribed to treat depression.[47]
Plaintiff did not comment on her past suicide attempt during the
clinical interview with Dr. Clansy on April 7, 2010.[48]  Dr. Clansy
noted that some of Plaintiff's answers were "questionable" and "she
appeared to have selective memory regarding specific dates and
information."[49]   A cognitive functioning test performed by Dr.
Clansy showed that Plaintiff's functioning and memory were within
normal limits.[50]

On January 26, 2010, a year after the alleged date of onset of
disability, Plaintiff was diagnosed with chronic hepatitis C.[51]  At
that visit, when asked to rate her health on a scale from one to
ten, with ten being the best, Plaintiff responded "9".[52]

On May 21, 2010, Plaintiff was diagnosed with diabetes
mellitus.[53]  Her diabetes was classified as Type II and was listed

---

[47]    See Tr. 331, 797.

[48]    See Tr. 658.

[49]    Id.

[50]    Tr. 659, 661.

[51]    See Tr. 762. As noted in medical records and at the hearing,
Plaintiff believed she was diagnosed with hepatitis B and not hepatitis C.
However, medical records show a consensus that Plaintiff was diagnosed with
hepatitis C.

[52]    See Tr. 763.

[53]    See Tr. 693.

as "uncontrolled" in medical records dated July 9, 2010.[54] At that time, Plaintiff denied blurred vision, numbness, and tingling.[55]

## B. Procedural History

### 1. Application to Social Security Administration

Plaintiff filed for disability insurance benefits and for supplemental security income on February 10, 2010.[56] Plaintiff claimed an inability to work due to left hand numbness, left leg weakness, stroke, depression, high blood pressure, and hepatitis C.[57]

In an undated disability report completed by Plaintiff, Plaintiff stated that she left her employment "because [she] was going to move to Florida, but things did not work out."[58] Plaintiff reported that even though she stopped working for reasons unrelated to her medical conditions, she believed her conditions were sufficiently severe as of October 15, 2009, to render her unable to work.[59] Her medications at the time were Amlodipine for reducing high blood pressure and a diuretic for treatment of diabetes.[60] Plaintiff reported no side effects from these medications at that

---

[54]   See Tr. 860, 862.

[55]   See Tr. 860.

[56]   See Tr. 20, 119-26.

[57]   See Tr. 147.

[58]   Tr. 148.

[59]   See id.

[60]   See 151, 216.

time.[61]  In an attorney-submitted medication list dated February 3, 2011, Plaintiff's medications also included Metformin, Novolin, and insulin injections for the treatment of diabetes and Oxybutynin for the treatment of incontinence.[62]  The extended medication list noted that six of Plaintiff's medications caused Plaintiff to feel fatigued and drowsy and required her to lie down two to three hours a day.[63]  The medication list reported that Plaintiff's diuretic caused her to urinate one to two times an hour.[64]

Plaintiff completed a Work History Report at the time of application.[65]  Plaintiff noted that her previous jobs as a supervisor verifying orders and as a call-taker required her to sit for eight hours per work day.[66]

Moira Dolan, M.D. ("Dr. Dolan") completed a Physical Residual Functional Capacity ("RFC") Assessment of Plaintiff on June 12, 2010.[67]  The assessment reflected that Plaintiff was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for about six hours in an eight-hour workday, sitting for about six hours in an eight-hour workday, and unlimited

---

[61]    See 151.

[62]    See Tr. 216–17.

[63]    See id.

[64]    See Tr. 216.

[65]    See Tr. 158–65.

[66]    See Tr. 161, 163.

[67]    See Tr. 669.

pushing or pulling.[68]  Dr. Dolan further found that Plaintiff could occasionally balance, stoop, kneel, crouch, crawl and climb a ramp or stairs but could never climb a ladder, rope, or scaffold.[69]  No other physical limitations were found.[70]

A Psychiatric Review Technique was completed on June 14, 2010, by Cate Miller, M.D. ("Dr. Miller").[71]  Dr. Miller found that Plaintiff had no medically determinable impairments.[72]  Dr. Miller noted that Plaintiff was cognitively intact with intact memory and concentration.[73]

The Commissioner denied Plaintiff's application at the initial and reconsideration levels.[74]  Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[75]  The ALJ granted Plaintiff's request and conducted a hearing on February 3, 2011.[76]

**2. Hearing**

---

[68]     See Tr. 670.

[69]     See Tr. 671.

[70]     See Tr. 672–76.

[71]     See Tr. 677.

[72]     See id.

[73]     See Tr. 689.

[74]     See Tr. 62–67.

[75]     See Tr. 77–78.

[76]     See Tr. 33.

Plaintiff and Cheryl Swisher ("Swisher"), a vocational expert, testified at the hearing.[77]  Plaintiff testified that she left her last job because she was going to pursue work as a caretaker for a friend.[78]  Plaintiff did not return to work when that opportunity fell through.[79]  When asked what she felt was preventing her from being able to work, Plaintiff responded "my memory" and "my incontinence problem."[80]  Plaintiff said that her medications caused her to have memory problems and kept her "kind of fuzzy."[81]  Plaintiff described her incontinence as causing her to use the restroom twice an hour for about four hours, after which time the urges lessened.[82]  Plaintiff testified that she was being treated by Dr. Pabbisetty and had been taking medication for her overactive bladder for one month.[83]  She stated that since beginning the treatment, her urges had been more frequent.[84]

Plaintiff testified that Dr. Pabbisetty was treating her diabetes and she was taking two types of insulin.[85]  When asked if

---

[77]     See Tr. 32-54.

[78]     Tr. 36.

[79]     Tr. 37.

[80]     Tr. 37-38.

[81]     Tr. 38.

[82]     Tr. 40.

[83]     Tr. 38, 40.

[84]     Tr. 40.

[85]     Tr. 38.

her diabetes was controlled, Plaintiff responded, "As far as I know."[86]   Plaintiff further stated that she was diagnosed with hepatitis but was receiving no treatment and did not have any symptoms.[87]   During the hearing, Plaintiff explained that she was taking medication for her hypertension and that it was under control.[88]

Plaintiff testified that she experienced residual left-side weakness from two previous strokes.[89]  Her left-side weakness made it difficult for her to walk and impacted the use of her left hand.[90]  Plaintiff testified that it was painful to sit or stand and that she would get tired.[91]  Plaintiff stated that her left leg was not coordinated with her right one.[92]  Plaintiff reported that she was unable to run.[93]  Plaintiff stated that she was able to walk without the assistance of cane but she had a limp, and she was able to climb stairs but she did so slowly.[94]  For a period of time,

---

[86]    Tr. 38–39.

[87]    Tr. 39.

[88]    Id.

[89]    Tr. 41, 43–44.

[90]    Tr. 41.

[91]    Id.

[92]    Tr. 48.

[93]    Id.

[94]    Id.

Plaintiff used a walker and then a cane to assist her mobility.[95]
Plaintiff reported that after her last stroke, the weakness in her
left arm and hand sometimes caused her to drop items she was
holding.[96]  Plaintiff stated that she had experienced headaches in
the past that she attributed to her past strokes but did not
remember being hospitalized for headaches.[97]

When questioned on her mental health history, Plaintiff denied
ever attempting suicide.[98]   She reported that she had taken
medication for depression but stopped taking the medication without
the advice of her doctors.[99]

Plaintiff testified that she lived alone and did not drive
because she was without a vehicle, though she believed she was
still able to drive.[100]  Plaintiff described her days as consisting
of watching television for three hours a day and napping.[101]
Plaintiff stated that she had difficulty walking up and down aisles
and required assistance when shopping.[102]

---

[95]   Tr. 43-44.

[96]   Tr. 44-45.

[97]   Tr. 45.

[98]   Id.

[99]   Tr. 46-47.

[100]   Tr. 47.

[101]   Tr. 39, 41.

[102]   Tr. 47.

Having reviewed the record and after hearing Plaintiff's testimony, Swisher categorized Plaintiff's prior work as a taxi call taker as sedentary and semi-skilled, and her work as a caterer assistant as light and semi-skilled.[103]   Due to a lack of a corresponding entry in the Dictionary of Occupational Titles ("DOT"), Swisher equated Plaintiff's job as a supervisor verifying orders to that of an order clerk position, finding the job to be best characterized as sedentary and semi-skilled.[104]   The ALJ asked Swisher to evaluate the occupational opportunities for a hypothetical person of advanced age who is literate, has a high school degree, and had the same vocational background as Plaintiff.[105]   In the first hypothetical question, the ALJ asked Swisher to assume that the hypothetical individual could stand and walk for two to three hours out of an eight-hour workday, could sit and walk for two to three hours out of an eight-hour workday, and could sit for six hours out of an eight-hour workday.[106]   The ALJ further limited the hypothetical individual to lifting, carrying, pushing and pulling a maximum of ten pounds, and to never being able to use ropes, ladders or scaffolds.[107]   The individual also was

---

[103]     Tr. 51.

[104]     Tr. 51-52

[105]     Tr. 52.

[106]     Id.

[107]     Id.

"limited to frequent, in terms of left reach, left overhead reach."[108]   Taking into consideration memory problems, the individual was limited to detailed, but not complex, tasks.[109] Considering all the limitations and abilities of the hypothetical individual, Swisher testified that such an individual could perform Plaintiff's past work as a call taker and as a supervisor.[110] However, Swisher testified that Plaintiff's job as a caterer assistant could not be performed by the hypothetical person with the aforementioned impairments.[111]

The ALJ then proposed a second hypothetical to Swisher.[112]  The ALJ asked whether the aforementioned hypothetical individual would be able to maintain employment if she were required to take unscheduled breaks of sixty to ninety minutes each eight-hour workday.[113]  Swisher stated that such a person could not sustain employment.[114]   In a third scenario, the ALJ asked whether the hypothetical individual could maintain employment if she were to miss three or more work days out of each work month.[115]  Swisher

---

[108]   Id.

[109]   Id.

[110]   Tr. 52–53.

[111]   Tr. 53.

[112]   Id.

[113]   Id.

[114]   Id.

[115]   Id.

responded that such an individual would not be able to sustain employment.[116]

### 3. Commissioner's Decision

On February 22, 2011, the ALJ issued an unfavorable decision.[117] The ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period and that she had multiple impairments (hypertension, status post cerebrovascular accident, and diabetes mellitus) that were severe.[118] Because Plaintiff's hepatitis was asymptomatic and thus did not reflect functional limitations, the ALJ found it to be a non-severe impairment.[119] Plaintiff's impairments, individually or collectively, did not meet or medically equal any of the listed impairments in the listings of the regulations[120] (the "Listings"), according to the ALJ.[121]

In determining Plaintiff's RFC to perform work-related activities, the ALJ considered the entire record, including Plaintiff's testimony.[122] The ALJ found that Plaintiff was capable of work with the following limitations: standing or walking two to

---

[116]   Id.

[117]   See Tr. 16–30.

[118]   See Tr. 21–22.

[119]   See Tr. 22.

[120]   20 C.F.R. Pt. 404, Subpt. P, App. 1.

[121]   See Tr. 22.

[122]   See Tr. 23.

three hours in an eight-hour workday, with normal breaks and the
use of a prescribed cane; sitting six hours in an eight-hour
workday, with normal breaks; lifting or carrying ten pounds
occasionally and ten pounds frequently; and pushing or pulling ten
pounds occasionally and ten pounds frequently.[123]  The work could
occasionally require climbing stairs but could not include climbing
ropes, ladders, or scaffolds.[124]  Additionally, only occasional
balancing, stooping, kneeling, crouching, or crawling could be
performed.[125]  Further, the ALJ stipulated that the work must be
limited to frequent, but not constant, reaching in any direction
with the non-dominant left arm due to residual left-side
weakness.[126]  Finally, the ALJ limited the work to understanding,
remembering, and carrying out detailed, but not complex,
instructions.[127]

Although the ALJ found that Plaintiff's medically determinable
impairments could cause the alleged symptoms, he did not find
Plaintiff's "statements concerning the intensity, persistence and
limiting effects of these symptoms" to be credible to the extent
they were inconsistent with the RFC determination.[128]  The ALJ

---

[123]    See id.

[124]    See id.

[125]    See id.

[126]    See id.

[127]    See id.

[128]    Tr. 24.

stated that Plaintiff's hypertension was well-controlled, as noted by her April 2010 consultative exam and by her own admission.[129] Further, the ALJ found that "the objective evidence [was] inconsistent with the severity of the symptoms alleged" when assessing Plaintiff's diabetes.[130]  The ALJ noted that Plaintiff's diabetes was not diagnosed until June 2010, nearly eighteen months after the alleged onset date of disability, and that the record indicated that she had not experienced any of the disabling limitations that might be associated with diabetes.[131]  Finally, the ALJ stated that, regarding Plaintiff's strokes, the objective evidence did not support the type of debilitating symptoms alleged by Plaintiff.[132]  Relying on the vocational expert's testimony that a hypothetical individual with Plaintiff's RFC would be able to perform Plaintiff's past work as a taxi call taker and supervisor verifying orders, the ALJ found Plaintiff not to be disabled.[133]

Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[134]

---

[129]   See id.

[130]   Id.

[131]   See id.

[132]   See id.

[133]   See Tr. 25.

[134]   See Tr. 1–4.

Plaintiff then timely sought judicial review of the decision by this court.

## II.   Standard of Review and Applicable Law

Judicial review of a final decision by the Commissioner denying disability benefits is limited to two determinations: 1) whether substantial evidence of the record supports the decision; and 2) whether the ALJ applied proper legal standards in evaluating the record.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).

## A. Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423 (d)(1)(a); see also Greenspan, 38 F.3d at 236.  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings.  42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that

20

disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520, 416.920.   By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth.   Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999).   If the Commissioner satisfies her step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested.   Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).   The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.   Greenspan, 38 F.3d at 236.

## B. Substantial Evidence

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion."   Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).   It is "something more than a

scintilla but less than a preponderance." Id. The Commissioner has the responsibility of deciding any conflict in the evidence. Id. If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown v. Apfel, 192 F.3d 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff contends that the Commissioner's decision is not supported by substantial evidence and that the ALJ did not follow proper legal standards. In particular, Plaintiff argues that: (1) the ALJ's RFC determination was not supported by substantial evidence; (2) the ALJ failed to conduct a meaningful review of the physical and mental demands of

22

Plaintiff's past relevant work; and (3) Plaintiff's past work requirements, as performed, exceeded the limitations enumerated in the ALJ's RFC determination.[135]   Defendant argues that the decision is legally sound and is supported by substantial evidence.   The court considers the merits of the arguments in turn.

## A. RFC Determination

Plaintiff contends that the ALJ's RFC determination failed to take into account all of Plaintiff's work-related limitations, both physically and mentally, and is contrary to the medical evidence in the record.   In particular, Plaintiff points to medical records which indicate that Plaintiff experienced residual left-side weakness from strokes, affecting the strength in her left arm and her mobility.   Also, Plaintiff argues that the ALJ did not account for the limitations Plaintiff would experience in the workplace with decreased memory, an alleged side-effect of her medications.

With respect to Plaintiff's residual left-side weakness, the record shows that, in October 2009, after the date of onset, Plaintiff walked to the emergency room from her home and was ambulatory and steady.   During her January 2010 visit with Dr. Damaske, Plaintiff reported not having physical limitations and did not use a cane or walker.   Although Dr. Pabbisetty referred Plaintiff to physical therapy after diagnosing her with left-side weakness and an abnormal gait in February 2010, Plaintiff's

---

[135] See 20 C.F.R. Part 404, Subpt. P, App. 2, Rule 201.06.

physical therapy evaluation in April 2010 showed that she was capable of walking without an assistive device despite the weakness she was experiencing.  Further, during an April 2010 consultative examination with Dr. Sahi, Plaintiff walked without the assistance of a cane or walker.  Dr. Sahi also found that Plaintiff was able to use her dominant right hand to perform tasks like writing and holding cups.  A medical record dated May 2010 indicated that Plaintiff's gait was steady.  In July and December of 2010, Plaintiff denied complications from her strokes, reporting that she had no residual weakness.

Given the volume of evidence contrary to Plaintiff's subjective testimony evaluating her condition as disabling, the ALJ's RFC assessment that Plaintiff was somewhat limited in mobility is supported by substantial evidence.  Because the ALJ incorporated the alleged left-side weakness into Plaintiff's RFC by limiting the duration of sitting, standing, and walking, limiting the weight of items Plaintiff could carry, push, and pull, and limiting Plaintiff's range of motion on the left side, the court must assume that the ALJ considered and weighed the entirety of the evidence.

Regarding Plaintiff's argument that the ALJ failed to properly assess Plaintiff's mental capacity to perform work-related activities, the court notes that the ALJ specifically included Plaintiff's limited ability to understand, remember, and carry out

detailed, but not complex, instructions in his RFC determination. Other than Plaintiff's own subjective testimony which the ALJ found lacked credibility, the record is devoid of any medical findings that support the claim that Plaintiff suffered from debilitating memory loss as a result of her medications.  In fact, after the date of onset, in April 2010, an assessment of Plaintiff's mental status showed that her cognitive functions were within normal limits and her memory was intact.  Accordingly, the court finds that substantial record evidence supports the ALJ's RFC determination.

**B. <u>Assessment of Past Relevant Work</u>**

Plaintiff argues that the ALJ did not conduct a meaningful assessment of the physical and mental demands of Plaintiff's past relevant work as a taxi call taker and a supervisor verifying orders.  Specifically, Plaintiff contends that the ALJ improperly relied on the testimony of the vocational expert and generic classifications, taking issue with the vocational expert's characterization of the taxi call taker position as sedentary and semi-skilled without citation to the DOT. The court disagrees.

Plaintiff fails to support her argument that the ALJ's failure to cite corresponding DOT positions for her work as a taxi call taker and a supervisor verifying orders resulted in error.  The ALJ may use the services of the vocational expert or employ other resources, such as the DOT, to obtain evidence necessary in

determining whether Plaintiff can perform past relevant work.  20 C.F.R. § 416.960(b)(2).  Further, the Fifth Circuit has found that "the DOT job descriptions should not be given a role that is exclusive of more specific vocational expert testimony with respect to the effect of an individual claimant's limitations on his or her ability to perform a particular job."  Carey, 230 F.3d at 144.

At the hearing, the vocational expert provided her expert opinion that the call taker position was best characterized as sedentary and semi-skilled.  The vocational expert explicitly cited the DOT when equating Plaintiff's past work as a supervisor to that of an order clerk position, basing her opinion on Plaintiff's testimony and the record as a whole. Moreover, the ALJ referenced the DOT in his decision, noting that the vocational expert's opinion is consistent with the information contained in the DOT. The ALJ is entitled to rely on the vocational expert's testimony even if that expert's testimony is in conflict with the DOT. Carey, 230 F.3d at 144.  Given the above, the court finds that Plaintiff's attempt to find error in a lack of a DOT citation in the ALJ's decision lacks merit and the ALJ properly relied on the vocational expert's knowledge and characterization of Plaintiff's past work.

**C. Medical-Vocational Guidelines**

Plaintiff argues that she should be found disabled pursuant to the Medical-Vocational Guidelines[136] because the ALJ's RFC determination, limiting Plaintiff to sitting for six hours in an eight-hour workday, is inconsistent with her Work History Report, in which Plaintiff indicated that her past relevant work required that she sit for eight hours in a workday. The ALJ, however, relied on the vocational expert's testimony that a hypothetical individual who shared Plaintiff's limitations, including sitting for a maximum of six hours in an eight-hour workday, could perform Plaintiff's past job as a call taker and as a supervisor.

As discussed above, the ALJ is entitled to rely on the vocational expert's knowledge of a job's requirements provided the record reflects an adequate basis for doing so. See Carey, 230 F.3d at 146. "The value of a vocational expert is that [she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986); see also Vaughan v. Shalala, 58 F.3d 129 (5th Cir. 1995). The evidence presented by the vocational expert may be used to evaluate the accuracy of the Plaintiff's subjective description of her past work. 20 C.F.R. § 416.960(b)(2). Despite the inconsistencies between Plaintiff's subjective testimony regarding the requirements

---

[136]   The Medical-Vocational Guidelines can be found at 20 C.F.R. Pt. 404, Subpt. P, App. 2.

of her past work and the ALJ's decision, the ALJ's reliance on the vocational expert's knowledge of the jobs in question and their requirements is wholly appropriate and legally sound.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that the Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Cross-Motion for Summary Judgment be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 2nd day of July, 2013.

Nancy K. Johnson
United States Magistrate Judge